## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARJORIE ROSENTHAL BLOOM
8101 Connecticut Ave., Apt. C-706
Chevy Chase, MD 20815,

*Plaintiff*,

v.

PNC BANK, N.A.
PNC Tower, 18th Floor
300 5th Ave.
Pittsburgh, PA 15222,

*Defendant*.

Civil Action No.: _____

## COMPLAINT

Plaintiff Marjorie Rosenthal Bloom ("Plaintiff" or "Ms. Bloom"), by and through undersigned counsel, as and for her Complaint against Defendant PNC Bank, N.A. ("Defendant" or "PNC"), alleges as follows:

## NATURE OF THE ACTION

1.     This case is a breach of contract and negligence action by which Ms. Bloom seeks to recover funds stolen after PNC ignored blatant and repeated evidence of suspicious banking activity connected to Ms. Bloom's personal PNC checking account ("the Account").

2.     Ms. Bloom and PNC entered into the *PNC Account Agreement for Personal Checking, Savings and Money Market Accounts* (the "Account Agreement")[1] when Ms. Bloom opened the Account in 2009, establishing a contract between Ms. Bloom as customer and PNC as

_____

[1] A true and correct copy of the Account Agreement operative as of June 1, 2021, is attached hereto as Exhibit A, which accurately reflects the terms of the Account Agreement in effect during the period described in these pleadings.

Ms. Bloom's banking institution. Implicit in the Account Agreement is PNC's duty to exercise ordinary or reasonable care in the performance of its contractual responsibilities and to execute its contractual duties in a commercially reasonable manner and without negligence.

3.      In the spring of 2021, Ms. Bloom was the target of a computer scam by which fraudsters, posing as a Microsoft engineer and a PNC fraud investigator, coerced her into liquidating her financial assets, directed her to deposit the liquid assets into the Account, and thereafter had her wire transfer the assets into the possession and control of the fraudsters.

4.      Contrary to Ms. Bloom's historical use of the Account, the funds, totaling $661,000, moved into and out of the Account through a series of two exceptionally large deposits and five wire transfers completed in quick succession over a period of only 29 days. This banking activity occurred from bank locations in three different jurisdictions. Ms. Bloom ordered all five wire transfers in-person at PNC bank branches, where she interacted directly with PNC consumer banking personnel who observed her, reviewed her account information, and processed each wire transfer.

5.      As a national association bank, PNC is subject to the Bank Secrecy Act ("BSA") and its implementing regulations, which establish an array of anti-money laundering ("AML") procedures and practices and which mandate the tracking and reporting of all bank transactions that are over a certain dollar amount and that exhibit certain suspicious characteristics. To this end, PNC employs multiple sophisticated systems and processes designed to identify suspicious transactions. In addition, PNC has adopted its own *Code of Business Conduct and Ethics* ("the PNC Code of Business Conduct"), which it makes publicly available on its website and which establishes clear protocols and procedures for PNC employees, who are trained to recognize suspicious transactions and required to take appropriate action.

6.     In several jurisdictions where PNC maintains bank branches, it also is required to comply with certain state laws and regulations concerning the recognition and reporting of suspected elder abuse or financial exploitation. Moreover, PNC actively participates in state initiatives intended to identify and prevent the financial exploitation of vulnerable adults, such as Maryland's Stop Adult Financial Exploitation ("Project SAFE"). By accommodating state laws, regulations, and initiatives that are concerned with protecting the elderly from financial exploitation, PNC has made care of its older customers and special attention to their anomalous transactions fundamental elements of its consumer banking operations.

7.     Despite its sophisticated, federally mandated systems designed to detect suspicious transactions and its robust policies intended to ensure that its customer-facing employees have the knowledge and skill to recognize elder financial exploitation, PNC repeatedly ignored the obvious red flags raised by each of Ms. Bloom's five transactions in the spring of 2021. PNC employees took no action to investigate Ms. Bloom's wire transfer requests or to determine whether her assets were at risk. Instead, when faced with textbook evidence of financial exploitation, PNC employees did nothing.

8.     PNC's utter failure to recognize that Ms. Bloom was being exploited financially and its failure to take any action to protect her assets when confronted with clear evidence of exploitation constitutes a breach of its contractual duty of ordinary or reasonable care and negligence in its dealings with Ms. Bloom.  Ms. Bloom therefore brings this action for breach of contract and negligence to enforce PNC's duty of care.

9.     As a result of PNC's breach of contract and negligence, Ms. Bloom was defrauded of assets totaling $661,000.00. But for PNC's careless and negligent actions in this matter, Ms. Bloom would not have lost these amounts.

10.     Ms. Bloom now brings suit to recover those funds.

## THE PARTIES

11.     Plaintiff Marjorie Rosenthal Bloom is a resident of Maryland who maintained a personal PNC Bank checking account from 2009 through 2022.

12.     Defendant PNC Bank, N.A. is a national association bank in the Commonwealth of Pennsylvania that maintains its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

13.     Ms. Bloom is a resident of Chevy Chase, Maryland. PNC is organized in and maintains its principal place of business in Pittsburgh, Pennsylvania. Accordingly, there is complete diversity between the parties as to these claims. As alleged herein, the amount in controversy between the parties exceeds $75,000, exclusive of interest and costs.

14.     By virtue of the foregoing facts, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

15.     This Court has personal jurisdiction over PNC because Ms. Bloom's claims against PNC arise from PNC's contacts with the District of Columbia. Ms. Bloom opened her checking account at a PNC branch location in the District of Columbia and therefore established her contractual relationship with PNC in the District of Columbia. In addition, several of the interactions between Ms. Bloom and PNC employees in which the employees failed to recognize that Ms. Bloom was being exploited and failed to take protective action occurred in-person at a PNC branch location in the District of Columbia. Two of Ms. Bloom's wire transfers and one of her exceptionally large ATM deposits were executed at a District of Columbia branch location.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of Ms. Bloom's banking activity and interactions with PNC employees occurred in the District of Columbia.

## **FACTUAL ALLEGATIONS**

### I.   **Ms. Bloom Was a Victim of Fraud.**

17.     Ms. Bloom is a 75-year-old widow, a retired federal employee, who lives in Montgomery County, Maryland.

18.     On April 22, 2021, Ms. Bloom was targeted in a "tech support scam"[2]— a scheme by which malicious software posing as a threat alert seized her computer functions and directed her to call a Microsoft customer support telephone number listed on her screen.

19.     Unable to control her computer, Ms. Bloom called the telephone number listed on her screen and found herself connected to a "Microsoft engineer," to whom Ms. Bloom explained the situation. This "Microsoft engineer" stated that Ms. Bloom was currently under attack from foreign hackers, that they had compromised both her computer and her iPhone, and that they had acquired all of her personal information: her name, address, telephone number, date of birth, Social Security number, and email address.

20.     The "Microsoft engineer" then asked Ms. Bloom about the security of her bank accounts. When Ms. Bloom informed the "Microsoft engineer" that she banked with PNC, he offered to transfer her on a "secure telephone line" to PNC's "fraud hotline" so that she could ascertain whether her funds in the Account were safe.

---

[2] *See* "How to Spot, Avoid, and Report Tech Support Scams," FT (Feb. 2019), https://www.consumer.ftc.gov/articles/how-spot-avoid-and-report-tech-support-scams (last accessed Apr. 29, 2022).

21.     Ms. Bloom then was connected with a "PNC fraud investigator," who informed her that there were $29,000 in alleged transactions pending against the Account. Moreover, Ms. Bloom was told that PNC had received a message from Ms. Bloom's email account validating the purchases. When Ms. Bloom said that she had received no inquiry from PNC and certainly had not validated the purchases, the "PNC fraud investigator" explained that the hackers must have imaged her email account to prevent her from seeing inquiries from PNC, thereby enabling them to drain the Account without her detection.

22.     Because the hackers had possession of her social security number, the "PNC fraud investigator" emphasized to Ms. Bloom that none of her assets were secure and that they had to be moved without delay to a new account that had not been compromised.

23.     Over the next several weeks, the "Microsoft engineer" purported to work with Ms. Bloom to regain control of her computer from the "hackers" while the "PNC fraud investigator" purported to assist Ms. Bloom in protecting her financial assets. They impressed upon Ms. Bloom that the secrecy of their efforts was essential. However, these two individuals were in fact fraudsters who took advantage of Ms. Bloom's age, her widow status, her limited familiarity with modern technology, her lack of understanding of cryptocurrency, her fear of losing her retirement savings, and her reliance on and trust in PNC as her financial institution to abscond with her financial assets.

24.     Under the pretense of securing her assets from hackers, the fraudsters convinced Ms. Bloom to liquidate her annuity and her stock portfolio, to deposit the liquidated assets into the Account, and thereafter to move the liquidated assets in a series of wire transfers to a third-party account at Signature Bank in New York (the "Signature Bank Account"). From there, the funds were transferred to an account with the cryptocurrency trading platform Coinbase (the "Coinbase

Account"), which the fraudsters had created using Ms. Bloom's picture and personal information. Once the funds were transferred to the Coinbase Account, the funds were converted to cryptocurrency.

25.     Beginning on April 22, 2021, hundreds of thousands of dollars were moved into and out of Ms. Bloom's PNC Account. By May 21, 2021, over a period of less than a month, $661,000 was deposited into and transferred out of the Account by way of five wire transfers. On May 28, 2021, Ms. Bloom realized that her life savings in fact had been stolen. That day, she filed a report with PNC's actual customer support department and ultimately was able to freeze the Account. An investigation determined that the fraudsters had transferred the cryptocurrency assets from the Coinbase Account to offshore accounts on the Binance cryptocurrency trading platform in the Cayman Islands, from which the assets apparently cannot be recovered.

## II.  PNC Facilitated Five Wire Transfers for Ms. Bloom.

26.     Ms. Bloom opened the Account in 2009 at a PNC branch in Chevy Chase, Washington, D.C. From 2009 through 2017, the Account received bi-weekly automatic deposits of Ms. Bloom's relatively modest salary as a government employee. After retiring in January 2018, Ms. Bloom's salary was replaced by monthly deposits of Social Security payments and other government-funded retirement income. Otherwise, Ms. Bloom used the Account as an ordinary checking account for making everyday purchases.

27.     In contrast to this unremarkable banking activity, the fraudsters convinced Ms. Bloom to make deposits and send wire transfers in extraordinary amounts that were completely inconsistent with Ms. Bloom's historical use of the Account. These deposits and wire transfers were completed in three different jurisdictions in a highly suspicious pattern:

a.      On April 22, Ms. Bloom wired $26,000 from the Account to the Signature Bank Account from the PNC branch in Hawley, Pennsylvania.

b.      On April 27, *five days later*, after withdrawing her annuity with Great American Insurance Group, Ms. Bloom deposited a check for $237,486.59 into the Account at a PNC ATM in Gaithersburg, Maryland.

c.      On May 5, *eight days later*, Ms. Bloom wired $150,000 from the Account to the Signature Bank Account from the PNC branch in Chevy Chase, Washington, D.C.

d.      On May 6, *the very next day*, Ms. Bloom wired $85,000 from the Account to the Signature Bank Account from the PNC branch in Hawley, Pennsylvania.

e.      On May 17, *eleven days later*, Ms. Bloom deposited a check for $404,735.85, monies realized through liquidating her stock portfolio, into the Account at the PNC ATM in Chevy Chase, Washington, D.C.

f.      On May 19, *two days later*, Ms. Bloom wired $200,000 from the Account to the Signature Bank Account from the PNC branch in Chevy Chase, Washington, D.C.

g.      On May 21, *two days later*, Ms. Bloom wired $200,000 from the Account to the Signature Bank Account from the PNC branch in Hawley, Pennsylvania.

28.     Although Ms. Bloom was an ideal victim for this particular fraud scheme, it was executed successfully because PNC ignored its basic obligations to Ms. Bloom. PNC repeatedly failed to exercise ordinary or reasonable care and failed to act in a commercially reasonable manner and without negligence in its transactions with Ms. Bloom as its banking customer.

29.     Of all the PNC employees Ms. Bloom encountered in executing five wire transfers, only one employee posed more than the perfunctory inquiry necessary to complete the wire transfer. At the PNC branch in Hawley, Pennsylvania, on May 6, the employee assisting Ms.

Bloom was concerned whether the check for $237,486.59 deposited into the Account on April 27 was legitimate. Unable to access a copy of the check on his computer, the employee called the headquarters office and was assured that the check had cleared and the funds were available in the Account. Aside from his concern with the availability of the deposited funds, the employee did not inquire about or investigate the transaction at hand and took no note of the previous wire transfers of $26,000 on April 22 and $150,000 on May 5. This employee completed the $85,000 wire transfer on May 6 without knowing Ms. Bloom as a PNC customer, without questioning the large amount of money moving through the Account since April 22, and without any concern for the purpose of the wire transfer Ms. Bloom was seeking to complete.

30.     Otherwise, no PNC employee took issue with or inquired into any of Ms. Bloom's transactions in the spring of 2021.

### III. The Banking Industry Routinely Reports Incidents of Elder Abuse and Financial Exploitation.

31.     As required by statute, the BSA/AML programs must be designed to detect and notify federal authorities of potential wrongdoing through the generation of suspicious activity reports ("SARs"). *See, e.g.*, 12 C.F.R. § 208.62. A bank is obligated to file a SAR when it detects a known or suspected violation of federal law, known or suspected money laundering, or a violation of the BSA. *Id.* Such situations specifically include transactions involving funds totaling $5,000 or more and where "[t]he transaction has no business or apparent lawful purpose or *is not the sort in which the particular customer would normally be expected to engage*, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction." 12 C.F.R. § 208.62(c)(4)(iii); 12 C.F.R. § 353.3(a)(4)(iii); 31 C.F.R. § 1020.320(a)(2)(iii) (emphasis added).

32.     According to the most recent biennial survey by the American Bankers Association Foundation (the "ABA Foundation") on the banking industry's treatment of elderly customers, banks routinely generate SARs to report suspected elder financial exploitation and fraud.[3] Since 2013, the Financial Crimes Enforcement Network ("FinCEN"), which receives and maintains a database of SARs, has provided an electronic SAR filing with a designated category for "elder financial exploitation."[4]

33.     The ABA Foundation also determined that "[t]raining bank employees in fraud awareness and prevention is now standard practice among banks and arguably the best defense against elder financial exploitation."[5] Furthermore, "[m]ore than eight out of 10 banks require staff to undergo training in serving older customers and recognizing signs of fraud and exploitation."[6] "Most banks report that they conduct employee training both at the time of hiring and annually. Eighty-four percent of banks provide annual training for frontline staff."[7] Moreover, "[b]ank training to combat elder financial exploitation goes beyond frontline staff, giving banks more soldiers in the battle. Six out of 10 banks report requiring all staff, not just frontline customer service staff, to take training in how to detect and report elder financial exploitation."[8]

---

[3] American Bankers Ass'n Found., *Older Americans Benchmarking Report* 16 (2021), https://www.aba.com/-/media/documents/reports-and-surveys/2021-older-americans-benchmarking-report.pdf?rev=117d0bb2bc804d3981fd6e0cea158aa8 (accessed Apr. 29, 2022).

[4] Consumer Financial Protection Bureau, Suspicious Activity Reports on Elder Financial Exploitation: Issues and Trends 6 (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_suspicious-activity-reports-elder-financial-exploitation_report.pdf (accessed Apr. 29, 2022).

[5] American Bankers Ass'n Found., *Older Americans Benchmarking Report* 20.

[6] *Id.*

[7] *Id.* at 21.

[8] *Id.*

34.     The ABA Foundation also found that "[b]anks are assertive in protecting older customers. Nearly all banks surveyed (93%) report that they file a suspicious activity report (SAR), flag accounts, close accounts or report to Adult Protective Services (APS) when banks suspect elder financial exploitation."[9] Based on the ABA Foundation survey, banks have established a reasonable and customary industry norm to take some kind of protective action when facing an elderly customer presenting possible signs of financial exploitation.

## IV. PNC Maintains Federally Mandated and Internal Banking Standards, Practices, and Procedures Applicable to Suspicious Transactions.

### A. PNC Has Adopted Anti-Money Laundering Procedures Pursuant to the Bank Secrecy Act that Target Suspicious Transactions Like Ms. Bloom's Wire Transfers.

35.     As a national association bank, PNC is required to have an effective AML program. According to the BSA and its implementing regulations, a bank's effective AML program must include the development of internal policies and procedures, an ongoing employee training program, and an independent audit function to test internal programs. *See* 31 U.S.C. § 5318(h); 31 C.F.R. § 1020.210(a).

36.     To comply with the BSA, banks must remain vigilant for signs of suspicious activity. Specific red flags include when a customer sends "funds transfers in large, round dollar, hundred dollar, or thousand dollar amounts;" a customer's "transfer activity is unexplained, repetitive, or shows unusual patterns;" a customer's "payments or receipts [have] no apparent links to legitimate contracts, goods or services;" where "deposits are structured through multiple branches of the same bank;" when "an account with little activity . . . suddenly experiences large

---

[9] *Id.* at 4.

deposit and withdrawal activity;" and when a customer "makes high-value transactions not commensurate with the customer's known incomes."[10]

37.     Ms. Bloom's transactions met all of these criteria and were precisely the kind of activities that PNC's BSA/AML systems are designed to detect and flag for review.

**B. PNC's Has Adopted Additional Internal Employee Protocols and Procedures to Identify Suspicious Banking Transactions.**

38.     PNC has adopted additional internal protocols and procedures to address suspicious banking transactions. These internal protocols and procedures, applicable to all PNC employees, can be found in the PNC Code of Business Conduct.

39.     In the PNC Code of Business Conduct, PNC underscores its employees' responsibilities regarding money laundering. The PNC Code of Business Conduct mandates:

- Always know the parties with whom you are conducting business and be sure to perform all required due diligence with respect to customers, clients, and business partners.
- Be alert for transactions which are inconsistent with usual business practices, or which do not match the customer's or client's normal pattern of activity.
  . . .
- Know the procedures in your department for reporting suspicious activity pertaining to a customer or client, the source of their funds, or their transactions. You may report suspicious activity via a variety of approved ways, including by submitting an internal Security Incident Report or by notifying your manager. You may also contact the Corporate Ethics Office to report suspicious activity.[11]

40.     Clearly, PNC has committed significant resources to ensuring that its employees are empowered to implement its BSA/AML policies as well as the bank's additional protocols and

---

[10] *See* FFEIC, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* F-2, F-7–F-8 (2015), https://bsaaml.ffiec.gov/docs/manual/10_Appendices/07.pdf (accessed Apr. 29, 2022). .

[11] Code of Business Conduct and Ethics, 30, https://thepncfinancialservicesgroupinc.gcs-web.com/static-files/9bbed25f-9cfb-45d6-87b0-52b442c5f008 (accessed Apr. 29, 2022).

procedures to recognize when potentially fraudulent banking transactions require further investigation.

### C. PNC Supports Additional Measures to Detect and Prevent Financial Exploitation of Elderly Customers.

41.     Ms. Bloom's wire transfers were not simply generic suspicious transactions. Given Ms. Bloom's age and usual account activity, the transactions also bore the hallmarks of elder financial exploitation or elder abuse.

42.     Several jurisdictions in which PNC operates have laws encouraging or requiring banks to monitor and report elder financial exploitation and abuse. In the District of Columbia, bank managers who have substantial cause to believe that an adult is in need of protective services because of exploitation by another party immediately must report any and all relevant information to the District of Columbia government. *See* D.C. Code § 7-1903(a)(1), (c). In Maryland, banks are required to file a report with the relevant state and local authorities whenever an employee "has direct contact with an elder adult" and "observes or obtains knowledge of behavior or circumstances or transactions that lead the employee to know or have reasonable cause to suspect that the elder adult is the victim of financial abuse." Md. Code Ann., Financial Institutions Article § 1-306(d)(1). This report must be made to one of several parties, including the local law enforcement agency. *Id.* at § 1-306(d)(2)(i)(1). To comply with these requirements, PNC presumably has trained its employees to recognize elder financial exploitation and abuse and to take appropriate action.

43.     Consistent with these statutory requirements, PNC also participates in industry-level initiatives targeted at protecting older banking customers from exploitation and abuse. For example, in Maryland, PNC participates in Project SAFE, an informal public-private coalition that

works to identify and prevent the financial exploitation of vulnerable adults.[12] The coalition includes the Maryland Bankers Association, of which PNC is a member. Through Project SAFE, the Maryland Attorney General has published an extensive training manual for the financial and law enforcement communities on recognizing the warning signs of financial exploitation and responding to help protect elder adults.[13]

44.     PNC also advertises the purported strength of its own internal protections for older customers and holds itself out as having robust procedures to protect its older customers from financial exploitation. Indeed, PNC's website describes the red flags of financial exploitation of older adults, including "frequent large withdrawals," "debit transactions that are inconsistent for the customer," and "uncharacteristic attempts to wire large sums of money."[14] PNC and its employees must be particularly cognizant of these signs because, as PNC says itself, "[f]inancial exploitation of vulnerable adults is a growing problem that causes deep emotional and financial trauma."[15]

45.     PNC also advertises its successes in averting the financial exploitation of its older customers. PNC maintains one webpage describing how its fraud prevention team prevented $62,000 from being transmitted by an elderly customer to aggressive fraudsters.[16] PNC also maintains a separate webpage recounting other successes, including how an elderly customer's

---

[12] *See* "Project SAFE (Stop Adult Financial Exploitation)," Md. Dept. of Human Services, https://dhs.maryland.gov/office-of-adult-services/project-safe/ (accessed Apr. 29, 2022).

[13] *See* "Model Reference Manual for Financial Institution Employees," Maryland Project SAFE (2012), https://tinyurl.com/5fwu4a9d (accessed Apr. 29, 2022).

[14] "Financial Scams Target Elderly, Vulnerable," PNC, https://www.pnc.com/en/about-pnc/topics/pnc-pov/innovation-security/elder-fraud.html (accessed Apr. 29, 2022).

[15] *Id.*

[16] *Id.*

attempt to withdraw $14,000 from their account triggered an internal fraud investigation that led to the recovery of $5,000 the customer already had mailed to the fraudster.[17] The webpage further discusses the security measures PNC imposed that ultimately prevented the same customer from mailing $7,000 to the fraudster in a separate transaction.[18]

46.     Together, PNC's online materials demonstrate that the bank's internal protocols and procedures can be effective at preventing fraud against older customers even when relatively small amounts of money are at stake. The fact that Ms. Bloom's wire transfers escaped PNC's scrutiny despite most of her transactions being substantially greater than the largest dollar amount described on the PNC website demonstrates a negligent failure of PNC's internal protocols and procedures on Ms. Bloom's behalf as an elderly customer.

## V.   **PNC Failed to Exercise Ordinary Care in Fulfilling its Contractual Obligations and Failed to Act in a Commercially Reasonable Manner and Without Negligence in Protecting Ms. Bloom's Assets.**

47.     Given the federal and state legal requirements, the banking industry's customary practices, PNC's internal protocols and procedures, and the state initiatives described above, monitoring for and protecting its older customers from financial exploitation are fundamental elements of PNC's basic consumer banking operations. Ms. Bloom's bank transactions presented obvious signs of suspicious account activity. Those signs, red flags all, should have put PNC on notice that Ms. Bloom's assets were at risk.

48.     Ms. Bloom's wire transfers, singularly and collectively, should have triggered scrutiny under PNC's BSA/AML program as well as its internal employee protocols and

---

[17] "Fraud Fighter Saves Elder from Scams," PNC, https://www.pnc.com/insights/our-commitments/customers/fraud-fighter-rob-stover.html (accessed Apr. 29, 2022).

[18] *Id.*

procedures as found in the PNC Code of Business Conduct. The transactions represented a sudden change in account usage; large amounts of money began moving into and out of the Account in quick succession; several large transactions were made at bank and ATM locations in multiple states in an unusual pattern; the wire transfers were all large, round dollar amounts; and each wire transfer was sent to the same Signature Bank Account with the same perfunctory explanation on the wire transfer document.

49.     Each of Ms. Bloom's five wire transfers exceeded $5,000: one wire for $26,000; one wire for $85,000; one wire for $150,000; and *two wires for $200,000 each*. Once PNC personnel became aware of these irregularities, the PNC Code of Business Conduct clearly required PNC's customer-facing employees to take effective action to flag and investigate the purposes of these transfers. Moreover, reasonable and customary banking practices call for the completion of SAR forms with the designated category for "elder financial exploitation" and the filing of such forms with FinCEN.

50.     Under any circumstances, a bank customer frequently moving back and forth across state lines to send large, round dollar wire transfers from multiple bank branches to the same external bank account would be extremely suspicious. However, Ms. Bloom's anomalous banking activities were even more conspicuously problematic because they were totally inconsistent with Ms. Bloom's prior activities as a PNC banking customer and because they precisely align with what PNC itself says are the telltale signs of elder financial exploitation: "frequent large withdrawals," "debit transactions that are inconsistent for the customer," and "uncharacteristic attempts to wire large sums of money."[19]

---

[19] *Supra* note 14.

51.     For twelve years, Ms. Bloom's Account received routine deposits of a government salary and, after Ms. Bloom's retirement, Social Security benefits and a government annuity. Nowhere in Ms. Bloom's banking history had she indulged in "frequent large withdrawals" or "debit transactions" inconsistent with the deposits in the Account, nor had she sent wire transfers of any amount until the Spring of 2021, when she presented a classic example of elder financial abuse. From April 22 to May 21, 2021, Ms. Bloom deposited into and wired out of the Account $661,000, including five in-person bank transactions where PNC employees, purportedly trained to recognize elder exploitation, turned a blind eye not only to Ms. Bloom's obvious financial exploitation but also to their own employee protocols and procedures and customary banking practices that are designed and promulgated purposefully to protect an elderly customer's assets under these very circumstances.

52.     Only a single PNC employee performed any meaningful inquiry into one of Ms. Bloom's transfers, but not because he was concerned for Ms. Bloom's financial wellbeing or because she was being exploited. The employee merely wanted to confirm that Ms. Bloom had sufficient funds to complete the wire transfer.

53.     No PNC employee questioned any of the other wire transfers although each transfer was conducted in-person at a PNC branch. Not one of these PNC employees knew or recognized Ms. Bloom. Not one employee questioned the large amounts of money that were moving through the Account. Not one employee raised the matter with a bank supervisor. Not one employee recognized that these banking transactions, occurring rapidly in only 29 days, constituted suspicious activity. Not one employee followed clear PNC protocols and procedures for handling suspicious transactions. Without question or comment, the PNC employees facilitated the wire

transfers as though the transfers and movement of such relatively large sums of money were common banking activities for Ms. Bloom.

54.     The Hawley, Pennsylvania, branch employees should have been particularly astute to Ms. Bloom's situation. Hawley is a small, working-class town of approximately 1,200 people. The Hawley PNC branch closed on June 11, 2021, because few of its customers banked in person.[20] In stark contrast to the modest socioeconomic conditions in Hawley, Ms. Bloom wired $331,000 from the Hawley branch over the course of 29 days and three separate visits to the bank.

55.     Most likely, Ms. Bloom's wire transfers in the Spring of 2021 were some of the largest—if not the largest—in-person transactions completed at the Hawley PNC branch in the months before its closure. Moreover, Ms. Bloom is not a resident of Hawley. She was a stranger to the PNC employees at the Hawley branch. Nonetheless, the Hawley PNC branch allowed an unfamiliar elderly woman to send wire transfers totaling $311,000 through the local bank branch of this small, low-income community over the course of four weeks without asking more than a few perfunctory questions. Through its consistent and complete disregard for Ms. Bloom's wellbeing and its utter neglect for its obligations to its elderly customers, PNC allowed Ms. Bloom's life savings to pass through the Account and into the hands of criminal third parties.

## COUNT I
### Breach of Contract

56.     Ms. Bloom incorporates the allegations in Paragraphs 1–55 as if fully set forth herein.

---

[20] *See* "PNC Bank, Hawley to Close June 11," Tri-County Independent (Apr. 25, 2021), https://www.tricountyindependent.com/story/news/2021/04/25/location-scheduled-permanently-close-3-p-m-friday-june-11/7308297002/) (accessed Apr. 29, 2022).

57.     A banking institution's account agreement creates a contractual relationship between a bank and its customer. *Isaac v. First Nat'l Bank of Maryland*, *D.C.*, 647 A.2d 1159, 1161 (D.C. 1994) (citations omitted). Implicit in this relationship is the duty to exercise reasonable or ordinary care in the performance of the contract, thereby allowing a bank customer to sue in contract for breach of that duty. *See High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1570 (D.D.C. 1987) (citing *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 539 (1986)).

58.     Ms. Bloom's Account Agreement is a binding contract that arose when Ms. Bloom first opened the Account in 2009. By virtue of that contract, PNC owed Ms. Bloom an implicit duty of ordinary or reasonable care as a matter of contract.

59.     "Ordinary care" "means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." D.C. Code § 28:3-103(8); *see also* D.C. Code § 28:4-104(c) (adopting same definition by reference).

60.     The BSA/AML, the PNC Code of Business Conduct, the laws of the District of Columbia and Maryland, the publications associated with Project SAFE, and the customary banking practices outlined in the ABA Foundation's biennial survey establish that reasonable commercial standards in consumer banking require PNC to identify and investigate suspicious transactions by elderly customers and to intervene when that investigation yields evidence of financial exploitation or abuse. These heightened procedures to protect elderly customers from exploitation and abuse are fundamental elements of PNC's consumer banking operations and are incorporated into the duty of ordinary care PNC owes to its elderly banking customers.

61.     Ms. Bloom, an elderly consumer banking customer, made two massive Account deposits and ordered five large-dollar, round-number wire transfers in quick succession over 29

days from multiple PNC Bank branches in three different jurisdictions. These banking activities, involving a total of $661,000, were in sharp contrast to the historical spending habits of this elderly customer who lived on Social Security payments and a government annuity.

62.     When Ms. Bloom ordered each of the wire transfers at issue in this action, she presented to PNC bank personnel clear and obvious evidence of financial exploitation. Under the circumstances, reasonable or ordinary care required PNC to investigate each of Ms. Bloom's highly suspicious wire transfers, freeze the Account, and take the steps necessary to protect her assets. Instead, PNC repeatedly ignored every red flag signaling that Ms. Bloom was being defrauded and that her assets were in jeopardy. Not one PNC employee inquired into any of Ms. Bloom's highly suspicious wire transfers, froze the Account, or took any other steps to protect her assets. PNC's failures to investigate and take protective action on five separate occasions constitute breaches of its duty of reasonable or ordinary care and breaches of contract under the Account Agreement by repeatedly ignoring all indications that Ms. Bloom was being defrauded and that her assets were in jeopardy.

63.     PNC's failures to investigate and intervene to stop each of Ms. Bloom's five wire transfers constitute five separate breaches of contract under the Account Agreement.

64.     PNC's acts of breach of contract have caused Ms. Bloom damages totaling $661,000.00.

65.     Ms. Bloom seeks these damages plus pre- and post-judgment interest, as well as her attorneys' fees, costs, and any other amounts the Court deems just and proper.

## Count II
### Negligence

66.     Ms. Bloom incorporates the allegations in Paragraphs 1–55 as if fully set forth herein.

67.     To establish a claim for negligence, District of Columbia law requires proof that the defendant owed the plaintiff a duty and that the defendant breached that duty, proximately causing damages to the plaintiff. *Sullivan v. AboveNet Communications, Inc.*, 112 A.3d 347, 354 (D.C. 2015).

68.     PNC owed Ms. Bloom a duty to act in a commercially reasonable manner and without negligence in all of her dealings with the bank.

69.     The BSA, the PNC Code of Business Conduct, the laws of the District of Columbia and Maryland, the publications associated with Project SAFE, and the customary banking practices outlined in the ABA Foundation's biennial survey establish that reasonable commercial standards in consumer banking require PNC to identify and investigate suspicious transactions by elderly customers and to intervene when that investigation yields evidence of financial exploitation or abuse. These heightened procedures to protect elderly customers from exploitation and abuse are fundamental elements of PNC's customer banking operations and are incorporated into the duty of ordinary care PNC owes to its elderly banking customers.

70.     Ms. Bloom, an elderly consumer banking customer, made two massive Account deposits and ordered five large-dollar, round-number wire transfers in quick succession over 29 days from multiple PNC Bank branches in three different jurisdictions. These banking activities, involving a total of $661,000, were in sharp contrast to the historical spending habits of this elderly customer who lived on Social Security payments and a government annuity.

71.     When Ms. Bloom ordered each of the wire transfers at issue in this action, she presented to PNC bank personnel clear and obvious evidence of financial exploitation. Under the circumstances, reasonable or ordinary care required PNC to investigate each of Ms. Bloom's highly suspicious wire transfers, freeze her account, and take the steps necessary to protect her

assets. Instead, PNC repeatedly ignored every red flag signaling that Ms. Bloom was being defrauded and that her assets were in jeopardy. Not one PNC employee inquired into any of Ms. Bloom's highly suspicious wire transfers, froze the Account, or took any other steps to protect her assets. PNC's failures to investigate and take protective action on five separate occasions constitute five separate breaches of its duty of reasonable or ordinary care and five separate acts of negligence under the Account Agreement by repeatedly ignoring all indications that Ms. Bloom was being defrauded and that her assets were in jeopardy.

72.     PNC failed to act in commercially reasonable manner when it negligently failed to investigate each of Ms. Bloom's five wire transfers and negligently failed to intervene to protect Ms. Bloom's assets despite being confronted with clear and obvious evidence of elder financial exploitation.

73.     PNC's negligence has caused Ms. Bloom damages totaling $661,000.00.

74.     Ms. Bloom seeks these damages plus pre- and post-judgment interest, as well as her attorneys' fees, costs, and any other amounts the Court deems just and proper.

<u>**PRAYERS FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

(a)     Awarding compensatory damages totaling not less than $661,000.00, plus pre- and post-judgment interest;

(b)     Awarding attorneys' fees, expenses, and the costs of ligation; and

(c)     Awarding such other and further relief which the Court finds just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


Dated: May 5, 2022                          Respectfully submitted,

                                            **SCHULMAN BHATTACHARYA, LLC**

                                            By:     /s/ Jeremy W. Schulman
                                                    Jeremy W. Schulman (D.C. Bar. No. 481755)
                                                    Schulman Bhattacharya, LLC
                                                    6116 Executive Blvd., Ste. 425
                                                    North Bethesda, MD 20852
                                                    Telephone: (240) 356-8550
                                                    jschulman@schulmanbh.com

                                                    *Counsel for Plaintiff*
                                                    *Marjorie Rosenthal Bloom*